UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF MISSISSIPPI
JACKSON DIVISION

JAMILA N. SLAUGHTER                                                                          PLAINTIFF

v.                                                         CIVIL ACTION NO. 3:11cv364-DPJ-FKB

WORD OF FAITH INTERNATIONAL
CHRISTIAN CENTER, D/B/A
WORD OF FAITH CHRISTIAN
CENTER-MISSISSIPPI, WORD OF FAITH
CHRISTIAN CENTER-MISSISSIPPI AND
BISHOP KEVIN WRIGHT                                                                        DEFENDANTS

ORDER

This sexual-harassment action is before the Court on Defendant Word of Faith Christian Center-Mississippi's (WOFCCM) Motion for Summary Judgment [62].[1] Plaintiff Jamila Slaughter opposes that motion and has also moved to strike [73] Defendant's amended memorandum [69]. Plaintiff's Motion to Strike [73] is denied. Further, the Court, having considered the issues and the parties' submissions in light of the applicable standards, finds that WOFCCM's Motion for Summary Judgment [62] should be granted in part and denied in part.

I.     Facts and Procedural History

Slaughter claims that she was sexually harassed by Bishop Kevin Wright (Wright), who was a spiritual leader at WOFCCM. For purposes of its motion, WOFCCM does not directly dispute the acts of alleged harassment presented in Slaughter's Second Amended Complaint [77] and her memorandum describing the alleged events. Def.'s Mot. [62] Ex. 5, Oct. 22, 2009 Memo Prepared by Jamila Slaughter [hereinafter "Slaughter Memo"]. And although Defendant does at one point mention in a footnote that all the claims against Wright have been denied, it is

---

[1] WOFCCM has since changed its name to Faith for Life Christian Center. Stramler Dep. 10–11. For the sake of consistency the Court will continue to refer to Defendant as WOFCCM.

unclear what evidence refutes the alleged harassment. Thus, the following facts are not at this point disputed.

Slaughter was a parishioner at the WOFCCM and worked as its receptionist from 2007 to 2010. According to Slaughter, Wright began sexually harassing her in late-2008, subjecting her to quid pro quo sexual harassment and a hostile-work environment. Over a ten-month period, Slaughter avers various advances, all generally focused on persuading her to begin a sexual relationship with Wright. This conduct included grabbing Slaughter and kissing her on the mouth; grabbing her by the hips and telling her that she knew what Wright wanted, Slaughter Dep. 36; repeatedly calling Slaughter into private moments with him on work-related pretext; winking, blowing kisses, hugging, and kissing Slaughter on the side of her head. Wright also called Slaughter's personal cell phone to tell her the two were together in his dreams. Then, on January 21, 2009, Wright left a gift bag on Slaughter's desk containing twenty dollars, a red blouse, and a note explaining the money was to buy her lunch and that he missed her.

Prior to January 21, 2009, Slaughter never mentioned Wright's behavior to her supervisor, Carol Woodson; the general manager and human resources representative, Jeffrey Lewis; or co-Bishop Leslie Wright, Kevin Wright's spouse. But after finding the January 21, 2009 gift bag, Slaughter was visibly upset, prompting Woodson to inquire. Slaughter then revealed Wright's conduct over the prior five weeks to Woodson. Although Woodson advised Slaughter—who was in her thirties—to tell her mother, Woodson never reported Wright's conduct to her own supervisors at WOFCCM.

Subsequently, Slaughter's mother met with Leslie Wright, and upon inviting Slaughter and Wright into the meeting, Slaughter told her story and Wright apologized and promised to

2

stop his behavior. Still, Slaughter initially wanted to resign, so Leslie Wright encouraged her to stay and told her to pray about the decision. She also asked Slaughter not to tell anyone about her husband's approaches. Finally, Leslie Wright informed Slaughter that she (Leslie Wright) would replace Woodson as Slaughter's direct supervisor.

Slaughter did return to work, and continued to work without incident until May 2009. Around this time, Wright allegedly resumed the harassment, asking Slaughter why she told on him and reminding her they were still together in his dreams. Over the next several months the advances continued with Wright winking, waving, and blowing kisses to Slaughter; mouthing "I love you" to her; asking about her daughter; giving her candy and offering to give her money; and inviting her to a football game, suggestively stating "the things I would do to you." Slaughter Memo 3. Slaughter did not report this conduct to her supervisor Leslie Wright or any other WOFCCM employees.

Slaughter ultimately filed an EEOC claim for sexual harassment on October 26, 2009. This came as a surprise to Lewis, as reports of sexual harassment had never left the Slaughter–Woodson–Wright circle. Slaughter voluntarily resigned in April 2010. The EEOC sent Slaughter its Determination on March 16, 2011, which found sexual harassment had occurred and that WOFCCM lacked sufficient anti-discrimination policies. The EEOC subsequently issued a right-to-sue letter on April 21, 2011. Thereafter, Slaughter filed this lawsuit on June 17, 2011. In it, she seeks damages under Title VII of the Civil Rights Act of 1964 and further contends that WOFCCM negligently hired, supervised, and retained Wright. Slaughter also seeks to hold WOFCCM vicariously liable for intentional and negligent infliction of emotional distress as Wright's employer.

II.       Standard

Summary judgment is warranted under Rule 56(a) of the Federal Rules of Civil Procedure when evidence reveals no genuine dispute regarding any material fact and that the moving party is entitled to judgment as a matter of law. The rule "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a sufficient showing to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

The party moving for summary judgment "bears the initial responsibility of informing the district court of the basis for its motion and identifying those portions of [the record] it believes demonstrate the absence of a genuine issue of material fact." *Id.* at 323. The non-moving party must then go beyond the pleadings and designate "specific facts showing that there is a genuine issue for trial." *Id.* at 324 (citation omitted). In reviewing the evidence, factual controversies are to be resolved in favor of the nonmovant, "but only when . . . both parties have submitted evidence of contradictory facts." *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc). When such contradictory facts exist, the court may "not make credibility determinations or weigh the evidence." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000). Conclusory allegations, speculation, unsubstantiated assertions, and legalistic arguments are not an adequate substitute for specific facts showing a genuine issue for trial. *TIG Ins. Co. v. Sedgwick James of Wash.*, 276 F.3d 754, 759 (5th Cir. 2002); *Little*, 37 F.3d at 1075; *SEC v. Recile*, 10 F.3d 1093, 1097 (5th Cir. 1993).

III.	Analysis

　　A.	Motion to Strike

In its original motion, WOFCCM stated its intent to amend the exhibits at a later time to include Lewis's then-unavailable deposition transcript. Def.'s Mot. [62] at 4 n.1. Specifically, WOFCCM stated in a footnote: "The deposition transcript of Jeffrey Lewis was not received prior to the motions deadline in this matter. Upon receipt of the transcript, counsel will supplement the Motion for Summary Judgment with appropriate excerpts." *Id.* Once it received the transcript, Defendant filed an amended supporting memorandum [69] and Slaughter moved to strike [73].

The only changes made in the amended memorandum are the insertion of an explanatory footnote and pinpoint citations in five places to match Lewis's previously included testimony. *See* Def.'s Am. Mem. [69] at 1 n.1, 5, 9, 13. Plaintiff was not prejudiced, and her Motion to Strike is therefore denied. WOFCCM's request for Rule 11sanctions is likewise denied because it was never docketed as a motion and thus fails to comply with Local Uniform Civil Rule 7(b).

　　B.	Correct Defendant

Slaughter was initially confused by her employer's corporate identity and sued "Word of Faith International Christian Center d/b/a Word of Faith Christian Center-Mississippi." Pl.'s First Am. Compl. [2]. WOFCCM contends that it is not a d/b/a, and by the time it moved for summary judgment, it had never been properly named as a defendant. WOFCCM also noted Slaughter's reluctance to correct this pleading error and therefore sought dismissal.

WOFCCM's argument is now moot. On July 13, 2012, while this motion was pending, the magistrate judge granted Slaughter leave to amend. Order [76] July 13, 2012, at 2. The

5

Second Amended Complaint now names WOFCCM and expressly avers that it was Slaughter's employer. Pl.'s Second Am. Compl. ¶ 7. WOFCCM neither appealed the Order nor moved to dismiss the complaint. Finally, no prejudice exists because WOFCCM has voluntarily defended the case from the outset. Its attorneys made an early appearance on behalf of WOFCCM, and WOFCCM answered the original and first amended complaints noting that it was "incorrectly sued" as a d/b/a of Word of Faith International Christian Center. *See* ECF Doc. 5, 6, 8, 9. In other words, WOFCCM maintained that it was the proper party but had been initially misnamed. Summary judgment is denied on this argument.

    C.    Title VII Claims

The Court must first determine whether this is a quid-pro-quo or hostile-work-environment claim. *Casiano v. AT&T Corp.*, 213 F.3d 278, 283 (5th Cir. 2000). A Title VII sexual-harassment case will proceed as a quid pro quo claim if the plaintiff has suffered a "tangible employment action." *Id.* In the absence of a tangible employment action, the case proceeds under the hostile-work-environment theory. *Id.*

        1.    Quid Pro Quo Claim

Slaughter first asserts a claim for quid pro quo sexual harassment under Title VII. To state a prima facie case of quid pro quo harassment, Plaintiff must show that (1) she "suffered a 'tangible employment action'" and (2) the "'tangible employment action resulted from her acceptance or rejection of her supervisor's alleged sexual advances.'" *La Day v. Catalyst Tech., Inc.*, 302 F.3d 474, 481 (5th Cir. 2002) (quoting *Casiano*, 213 F.3d at 283). If the plaintiff proves "that a tangible employment action resulted from a supervisor's sexual harassment" the

employer is held "vicariously liable, and no affirmative defense can be asserted." *Wyatt v. Hunt Plywood Co.*, 297 F.3d 405, 409 (5th Cir. 2002).

As to the first element, the Supreme Court has defined a tangible employment action as "a significant change in employment status such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Burlington Indus. v. Ellerth*, 524 U.S. 742, 761 (1998) (citations omitted). Here, Slaughter attempted to address the tangible-employment-action element in her complaint by averring that her continued employment with WOFCCM was conditioned upon Wright's request for sexual favors. Pl.'s Second Am. Compl. [77] ¶ 32. But Slaughter kept her job while rejecting the advancements, so her summary-judgment response takes a difference approach. According to Slaughter, she suffered two tangible employment actions: a reduction in hours/wages and being passed over for promotion.

Both a reduction in hours/wages and a failure to promote could present tangible employment actions. *See Ellerth*, 524 U.S. at 761 (holding that "failing to promote" can constitute tangible employment action); *Cotton v. Cracker Barrel Old Country Store, Inc.*, 434 F.3d 1227, 1231 (11th Cir. 2006) ("A reduction in an employee's hours, which reduces the employee's take-home pay, qualifies as a tangible employment action." (citing *Ellerth*, 524 U.S. at 761)). But to satisfy the second element of a quid pro quo claim, Slaughter must prove causation. *La Day*, 302 F.3d at 481 (holding that a plaintiff must show a "tangible employment action *resulted from* [her] acceptance or rejection of [her] supervisor's alleged sexual advances" (emphasis added) (citation and quotations omitted)).

Looking first to the hours/wages issue, Slaughter alleges that at some point after she reported Wright's advances, WOFCCM reduced her hours and pay. Slaughter Dep. 20. These facts are not disputed, at least on a generic level—Slaughter's hours and pay were cut. But Leslie Wright and Lewis gave unrebutted testimony that the cuts were merely "a cost cutting measure," Lewis Dep. 111, and that these were "across-the-board cutbacks." Leslie Wright Dep. 93. Even Slaughter explained in her deposition, "*we* cut the days *we* were working." Slaughter Dep. 20 (emphasis added); *see also id.* at 70 ("Everybody's schedule was changed. . . . So it wasn't just me. . . . [T]hey said it was in an effort to cut some of the costs . . . ."). Slaughter offers no evidence that the reduced hours/wages were discriminatory or that Wright caused the cuts. *See Russell v. Univ. of Tex. of Permian Basin*, 234 F. App'x 195, 202 (5th Cir. 2007) ("[Plaintiff's] quid pro quo sexual harassment claim cannot withstand [defendant's] motion for summary judgment because she has failed to demonstrate that [harasser] caused the tangible employment action. In other words, she has presented no competent summary judgment evidence that her alleged harasser was responsible for the decision not to hire her for the tenure-track position." (citing *Casiano*, 213 F.3d at 284–85)). Instead, Slaughter turns the burden on WOFCCM, arguing that it failed to better support its "across-the-board-cuts" argument. Slaughter, however, carries the burden of creating a triable dispute, and she has failed to demonstrate a nexus between the cuts and the alleged harassment.

As for the alleged failure to promote, Slaughter again fails to prove causation. There is no record evidence suggesting that a promotion was available, that Slaughter was passed over for it, or that she was even eligible for promotion. She further fails to allege that her rejection of Wright's advances caused a failure to promote or that he caused such a decision. *Id*. Instead,

Slaughter merely observes that she did not receive a promotion during her relatively short tenure at WOFCCM. Slaughter's quid pro quo claim must be dismissed under Rule 56 because she failed to prove a "tangible employment action resulted from her acceptance or rejection of her supervisor's alleged sexual advances." *La Day*, 302 F.3d at 481 (citations and quotations omitted).

2. Hostile-Work-Environment Claim

Slaughter alternatively pursues a hostile-work-environment claim under Title VII. To establish a hostile work environment claim against a supervisor, the employee must show:

> (1) that the employee belongs to a protected class; (2) that the employee was subject to unwelcome sexual harassment; (3) that the harassment was based on sex; and (4) that the harassment affected a "term, condition, or privilege" of employment.

*Lauderdale v. Tex. Dep't of Criminal Justice, Institutional Div.*, 512 F.3d 157, 163 (5th Cir. 2007) (quoting *Watts v. Kroger Co.*, 170 F.3d 157, 509 (5th Cir. 1999)); *see also Woods v. Delta Beverage Grp., Inc.*, 274 F.3d 295, 298 n.2 (5th Cir. 2001) (highlighting the *Watts* distinction between supervisor and co-worker harassment). The parties focus their dispute on the fourth element of the test—whether the conduct "affected a 'term, condition, or privilege' of [her] employment." *Harvill v. Westward Commc'ns, L.L.C.*, 433 F.3d 428, 434 (quoting *Woods*, 274 F.3d at 298).

To meet this element, "[t]he environment must be deemed 'both objectively and subjectively offensive, one that a reasonable person would find hostile or abusive, and one that the victim in fact did perceive to be so.'" *Lauderdale*, 512 F.3d at 163 (quoting *Faragher v. City of Boca Raton*, 524 U.S. 775, 787 (1998)); *see also Russell*, 234 F. App'x at 205 (citing *La Day*,

302 F.3d at 482). For sexual harassment to be actionable, it "must be sufficiently severe or pervasive 'to alter the conditions of [the victim's] employment and create an abusive working environment.'" *Lauderdale*, 512 F.3d at 163 (quoting *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 67 (1986)). An environment may be considered hostile if the conduct "undermines the plaintiff's workplace competence." *Harvill*, 433 F.3d at 434 (citation omitted).

When evaluating hostile-work-environment claims, courts "must look to the totality of the circumstances, including the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; . . . whether it unreasonably interferes with an employee's work performance[;] and whether the complained of conduct undermined the plaintiff's workplace competence." *Lauderdale*, 512 F.3d at 163 (citations and quotations omitted). But, one must bear in mind that "Title VII . . . is not a general civility code, and simple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment." *Id.* at 163 (citations and quotations omitted).

In this case, Slaughter creates a jury question as to whether the harassment was subjectively and objectively offensive. On the subjective side, she rejected Wright's advancements, and a jury could find that she was visibly upset and crying in January 2009 when she received his gifts. On the objective side, the alleged harassment occurred during a ten-month period from December 2008 to October 15, 2009. Slaughter Memo 1–4. During this time, Wright's alleged misconduct was both verbal and physical. According to Slaughter, Wright frequently propositioned her to be with him. On several occasions, Wright also winked at her, blew her kisses, offered and gave unwelcome gifts, and orchestrated private moments together

10

contrary to Slaughter's wishes. Slaughter Dep. 38; Slaughter Memo 1–2. Further, Slaughter claims that Wright frequently hugged her and kissed her on the side of her head; grabbed her by the hips and pulled her close to him, stating "you know what I want"; and at one time pulled her to him and kissed her on the mouth. Slaughter Memo 1–2; Slaughter Dep. 35–36, 38.

The Court recognizes that this behavior may be somewhat less severe than actionable conduct in other cases. *See*, *e.g.*, *Farpella-Crosby v. Horizon Health Care*, 97 F.3d 803, 805, 806 (5th Cir. 1996) (affirming denial of judgment as a matter of law where supervisor commented on plaintiff's private sexual life two-to-three times a week and vulgarly suggested she was promiscuous); *Harvill*, 433 F.3d at 435–37 (finding hostile work environment where over seven-month period co-worker "grabbed [employee] and kissed her on the cheek, popped rubber bands at her breasts, fondled her breasts 'numerous times,' patted her on her buttocks 'numerous times,' and came behind her and rubbed his body against her"). But when viewed in a light most favorable to the non-movant, a jury question exists whether the alleged conduct was sufficiently severe or pervasive to affect a term, condition, or privilege of employment. *See Alaniz v. Zamora-Quezada*, 591 F.3d 761, 768 (5th Cir. 2009) (affirming denial of JMOL and finding jury question whether sexual comments, propositions, and touching were sufficiently severe or pervasive); *Donaldson v. CDB Inc.*, 335 F. App'x 494, 496 (5th Cir. 2009) (reversing district court's finding that sexually explicit comments and propositions but no physical contact were insufficiently severe or pervasive to create question of fact); *see also Lauderdale*, 512 F.3d at 163–64 (recognizing that highly pervasive conduct may overcome lack of severity).

3. *Ellerth–Faragher* Defense

Having found that Slaughter's hostile-work-environment claim survives at the prima facie stage, the analysis turns to WOFCCM's assertion of the *Ellerth–Faragher* affirmative defense. *Faragher*, 524 U.S. at 807; *Ellerth*, 524 U.S. at 765. Under this defense, the employer must show: "(a) that the employer exercised reasonable care to prevent and correct promptly any sexually harassing behavior, and (b) that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise." *Watts*, 170 F.3d at 509–10 (quoting *Faragher*, 524 U.S. at 807). "[A]n employer must establish both prongs of the *Ellerth*/*Faragher* affirmative defense in order to avoid liability . . . ." *Donaldson*, 335 F. App'x at 504. And as an affirmative defense, the burden is plainly borne by the defendant. *Lauderdale*, 512 F.3d at 164 (quoting *Faragher*, 524 U.S. at 807).

Here, genuine issues of material fact preclude summary judgment based on the *Ellerth–Faragher* affirmative defense. First, a question of fact exists whether WOFCCM exercised reasonable care in preventing sexual harassment. WOFCCM asserts certain anti-harassment measures—including an employee handbook and training—but the record is far from clear as to when and precisely what WOFCCM provided *and conveyed* to its employees. *See*, *e.g.*, Woodson Dep. 10–11 (denying that WOFCCM employees received or discussed employee handbook before most of alleged misconduct). Second, a jury could find that Defendant failed to use reasonable care to correct the harassment once reported in January 2009. As noted, Slaughter was directed to discuss the matter with her mother and pray about returning to work. She was also placed under the supervision of Leslie Wright, the wife of the accused harasser. Slaughter

was allegedly told to report directly to Leslie Wright who asked Slaughter "to keep it quiet and not to tell anyone." Slaughter Dep. 64. There is at least a jury question whether WOFCCM exercised reasonable care to prevent harassment by requiring the alleged victim to work under and report to the alleged harasser's spouse, especially when the spouse asked her to "keep it quiet." Finally, whatever was done, there is sufficient record evidence to find that the harassment resumed. *See Hatley v. Hilton Hotels Corp.*, 308 F.3d 473, 475–76 (5th Cir. 2002) (affirming jury verdict over *Ellerth–Faragher* defense where investigation was lacking and harassment continued). Because a question exists as to the first prong of the defense, the Court need not address the second prong. Summary judgment on the basis of the affirmative *Ellerth–Faragher* defense is denied.

> D. State-Law Claims
>
> > 1. Negligent Hiring, Supervision, and Retention

Slaughter's Second Amended Complaint alleges WOFCCM "breached [its] duty to Plaintiff by negligently hiring, supervising and continuously retaining [Wright]." [77] ¶ 45. Mississippi courts treat such actions as simply negligence claims requiring the plaintiff to prove duty, breach, causation, and damages. *Roman Catholic Diocese of Jackson v. Morrison*, 905 So. 2d 1213, 1229 (Miss. 2005). "'[A]n employer will be liable for negligent hiring or retention of his employee when an employee injures a third party if the employer knew or should have known of the employee's incompetence or unfitness.'" *Parmenter v. J & B Enters., Inc.*, No. 2010-CA-01251-COA, 2012 WL 539949, at *7 (Miss. Ct. App. Feb. 21, 2012) (quoting *Doe ex rel. Brown v. Pontotoc Cnty. Sch. Dist.*, 957 So. 2d 410, 416–17 (Miss. Ct. App. 2007)). Specifically, Slaughter must show that WOFCCM "had either actual or constructive knowledge of [Wright's]

13

incompetence or unfitness before [it] will become liable for the negligent hiring or retention." *Doe ex rel. Brown*, 957 So. 2d at 417 (citing *Eagle Motor Lines v. Mitchell*, 785 So. 2d 482, 487 (Miss. 1955)); *see also Raiola v. Chevron U.S.A., Inc.*, 872 So. 2d 79, 86 (Miss. Ct. App. 2004) (citing *Jones v. Toy*, 476 So. 2d 30, 31 (Miss. 1985)). Here, Slaughter attempts to establish notice through Woodson's testimony regarding "stories" she heard about incidents involving Wright and other women. Woodson readily admitted that she had no first-hand knowledge of these incidents and did not "know the stories." Woodson Dep. 15.

As an initial matter, hearsay is not competent summary-judgment evidence. *Roberts v. City of Shreveport*, 397 F.3d 287, 295 (5th Cir. 2005) (holding that newspaper articles constitute hearsay and are not proper summary-judgment evidence). Slaughter is aware of this hurdle but contends that Woodson's testimony is excluded from the rule against hearsay under Rule 803(21), which applies to "reputation among a person's associates or in the community concerning the person's character." This argument might apply as to some of the testimony, but not all of it. Rule 405 of the Federal Rules of Evidence regulates the admissibility of reputation testimony. Rule 405(a) does not allow specific instances of conduct except on cross-examination. Thus, the specific instances Woodson heard through the grapevine are neither admissible nor competent under Rule 56(c). Moreover, Slaughter did not cite any testimony wherein Woodson was asked about Wright's reputation or Woodson's opinion of his character as Rule 405(a) would allow. It is not, therefore, apparent that the evidence could be offered in an admissible form as Rule 56(c) requires.

Even to the extent Woodson's testimony can be liberally read as admissible comment on reputation, it remains insufficient. First, although Woodson apparently heard "stories," she never

14

testified that she told anyone with a capacity to bind the church, and there was no evidence that such individuals shared Woodson's knowledge. Slaughter herself conceded that she was unaware of "any other sexual harassment committed against other women at the church." Slaughter Dep. 67. Second, Slaughter did not report her alleged harassment to WOFCCM after it resumed following the initial report. Third, there is no indication how many other women were involved, whether they complained to WOFCCM, or whether they were employees like Slaughter. *See* Woodson Dep. 17 (discussing what she heard regarding a non-employee). And fourth, Woodson fails to state when she heard the other "stories" or when they supposedly occurred. This final point is significant first to the negligent hiring component because the stories seem to relate to events at the church after Wright arrived, which would reflect no notice before he was hired. The timing could also impact the retention claim because WOFCCM apparently forced Wright from the church when Slaughter's EEOC claim was discovered, and there is no evidence WOFCCM knew about other stories before receiving that charge.

Ultimately, Slaughter is left making the inferential leap that because one employee heard "stories" at some undefined time, the employer must have known during a relevant time. But again, there is no proof cited that WOFCCM was actually or constructively on notice of Wright's reputation at a relevant time—assuming his reputation is properly supported with admissible evidence. Defendant's motion for summary judgment on Plaintiff's negligent hiring, supervision, and retention claims is therefore granted.

2. Intentional Infliction of Emotional Distress

In her complaint, Slaughter alleges intentional infliction of emotional distress from Wright's conduct and, more importantly for this motion, that WOFCCM's "failure to end the

15

inappropriate conduct [was] outrageous and beyond all decency." Pl.'s Second Am. Compl. [77] ¶ 40. Thus, from the face of the pleading the IIED count does not allege WOFCCM is vicariously liable for Wright's conduct but instead that WOFCCM's *response* to Wright's conduct constitutes intentional infliction of emotional distress.

"In order to prevail on a claim for intentional infliction of emotional distress, the severity of the conduct at issue must be 'so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.'" *Weible v. Univ. of S. Miss.*, 89 So. 3d 51, 64 (Miss. Ct. App. 2011) (quoting *Speed v. Scott*, 787 So. 2d 626, 630 (Miss. 2001)). "'[M]eeting the requisites of a claim for intentional infliction of emotional distress is a tall order in Mississippi.'" *Speed*, 787 So. 2d at 630 (quoting *Jenkins v. City of Grenada*, 813 F. Supp. 443, 446 (N.D. Miss. 1993)).

Although Slaughter is correct that proof of physical injury is not always required for IIED claim, in its place the alleged conduct must "'evoke[] outrage or revulsion'" and the result must have been reasonably foreseeable. *Jones v. Fluor Daniel Servs. Corp.*, 959 So. 2d 1044, 1048 (Miss. 2007) (quoting *Smith v. Malouf*, 722 So. 2d 490, 497 (Miss. 1998)). "The standard for mental anguish is elusive." *Wilson v. Gen. Motors Acceptance Corp.*, 883 So. 2d 56, 65 (Miss. 2004) (citation and quotations omitted). Nonetheless, it is the nature of the alleged act that gives rise to a legal remedy, not the seriousness of its consequences. *Jones*, 959 So. 2d at 1048 (quoting *Smith*, 722 So. 2d at 497).

Slaughter's allegations that WOFCCM "fail[ed] to end the inappropriate conduct" fall well short of the types of behavior typically rising to the level of intentional infliction of emotional distress. *Compare Smith*, 722 So. 2d at 491–92, 498 (reversing dismissal of IIED

claims for conspiring to illegally place child up for adoption contrary to unmarried father's wishes), *and Fuselier, Ott & McKee, P.A. v. Moeller*, 507 So. 2d 63, 66, 69 (Miss. 1987) (finding no IIED claim where law firm breached employment contract with attorney, changed the locks, and removed his name from the firm sign), *with Jones*, 959 So. 2d at 1048 (reversing dismissal of IIED claim where employer addressed employees with racial slurs and segregated them), *and T.G. Blackwell Chevrolet Co. v. Eshee*, 261 So. 2d 481, 486 (Miss. 1972) (finding outrageous conduct by dealership in forging purchaser's name, assigning contract to finance company, and harming purchaser's credit).

Furthermore, "'[a] claim for intentional infliction of emotional distress will not ordinarily lie for mere employment disputes.'" *Watts v. City of Jackson*, 827 F. Supp. 2d 724, 735 (S.D. Miss. 2011) (alteration in original) (quoting *Lee v. Golden Triangle Planning & Dev. Dist., Inc.*, 797 So. 2d 845, 851 (Miss. 2001)). IIED claims in this context have "'usually been limited to cases involving a pattern of deliberate, repeated harassment over a period of time.'" *Lee*, 792 So. 2d at 851 (quoting *Pegues v. Emerson Elec. Co.*, 913 F. Supp. 976, 982–83 (N.D. Miss. 1996)); *see also Skidmore v. Precision Printing & Packaging, Inc.*, 188 F.3d 606, 614–15 (5th Cir. 1999) (reversing a IIED verdict under Texas law where employee reported sexual harassment to supervisor once and supervisor instructed alleged harasser to leave employee alone). The alleged act here is substantially different from extreme conduct reserved for IIED claims. Thus, WOFCCM is granted summary judgment on Slaughter's IIED claim.

3. Negligent Infliction of Emotional Distress

The Mississippi Supreme Court has held that "'a plaintiff . . . may not recover emotional distress damages resulting from ordinary negligence without proving some sort of physical

manifestation of injury or demonstrable physical harm.'" *Wilson*, 883 So. 2d at 65 (quoting *Am. Bankers' Ins. Co. of Fla. v. Wells*, 819 So. 2d 1196, 1209 (Miss. 2001)); *see also Paz v. Brush Engineered Materials, Inc.*, 949 So. 2d 1, 4 (Miss. 2007). Additionally, "'the harm must have been reasonably foreseeable to the defendant'" before recovery is permissible. *Fouche' v. Shapiro & Massey L.L.P.*, 575 F. Supp. 2d 776, 788–89 (S.D. Miss. 2008) (quoting *Am. Bankers'*, 819 So. 2d at 1208).

Slaughter fails to plead any physical injury resulting from her emotional distress. Further, she has proffered no evidence supporting any "physical manifestation of injury or demonstrable physical harm." *Wilson*, 883 So. 2d at 65 (citation and quotations omitted). Slaughter's negligent infliction of emotional distress claim is therefore dismissed.[2]

IV.     Conclusion

The Court has considered all arguments. Those not addressed would not change the results. For the reasons stated, Plaintiff's Motion to Strike is denied. Additionally, Defendant's motion for summary judgement is granted with respect to the quid pro quo Title VII claim and all state-law tort claims. Summary judgment is denied on the hostile-work-environment claim. The parties are instructed to contact the Court to set the matter for pretrial conference and trial.

**SO ORDERED AND ADJUDGED** this the 15th day of November, 2012.

s/ *Daniel P. Jordan III*
UNITED STATES DISTRICT JUDGE

---

[2]Although Slaughter's complaint does list a litany of horrors—"Plaintiff Slaughter sustained pain and suffering, physical injury, great mental distress, depression, insomnia, shock, fright and humiliation"—such boiler-plate pleading of physical harm cannot preserve her negligent infliction of emotional distress claim. Pl.'s Second Am. Compl. [77] ¶ 47. Instead, Slaughter must go beyond the pleadings and point to specific evidence creating a question of fact.